IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GABRIEL ALFARO GUTIERREZ, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 3:18-cv-01036 |
| ) | Judge Frensley |
| BRENDA JANETH QUINTINO SANDOVAL, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM AND ORDER

### I. INTRODUCTION

This matter arose upon a Petition for Return of Child pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), and the implementing legislation in the United States, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*[1] Petitioner Gabriel Alfaro Gutierrez requests that this Court enter an Order directing that the Parties' minor child, G.A.A.Q., be returned to Mexico. He alleges that the child's mother, Brenda Janeth Quintino Sandoval, wrongfully removed the child from the sovereign nation of Mexico sometime between October 27, 2017 and early November 2017. Docket No. 1. Mr. Gutierrez claims that he has rights of custody of the child under the laws of Mexico in that he is the child's natural father and was married to Ms. Sandoval, and that he was actually exercising these rights within the meaning of the Hague Convention at the time of the child's wrongful removal. *Id.* at 3-8.

---

[1] Previously located at 42 U.S.C. § 11601, *et seq.*

Ms. Sandoval, proceeding pro se, contends that Mr. Gutierrez was not exercising his custodial rights at the time that she left Mexico with G.A.A.Q., and that she previously consulted her attorney in Mexico, who told her that "there would not be any problem." Docket No. 20-1, p. 1. She further contends that G.A.A.Q. does not want to be with his father, because his father bullies him about his weight and appearance and interrogates him about his mother's personal life. *Id.* She asserts that G.A.A.Q. is now present in a stable family that includes his stepfather and baby brother, and that he "can continue with his education, has more opportunities, and is in a safer environment here." *Id.* at 1-2. In an initial hearing before the Court, Ms. Sandoval stated that her son did not want to return to Mexico.

The Court held a bench trial in this matter on May 14, 2019. During the course of the trial, the Court took testimony from G.A.A.Q. in chambers, out of the presence of his parents and their attorneys. After the trial, the Parties were instructed to file proposed findings of fact and conclusions of law. Only Mr. Gutierrez did so, on June 18, 2019.

Having reviewed Mr. Gutierrez's proposed findings of fact and conclusions of law, the record, the exhibits received into evidence, and the testimony of the witnesses, including their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts which it deems to be immaterial to the issues presented.

## II. **FINDINGS OF FACT**[2]

Mr. Gutierrez and Ms. Sandoval married in 2003, and lived in Monterrey, Mexico. Their son, G.A.A.Q., was born in November 2003, and will be sixteen in November 2019. He is the only child of their marriage. He is a Mexican citizen with no other citizenship.

The Parties separated in 2004 and never lived together again. They were legally divorced in 2012. G.A.A.Q. has always lived with Ms. Sandoval. Following the Parties' separation, by agreement, Mr. Gutierrez had visitation with G.A.A.Q. consisting of every Saturday for eight hours, plus additional time in 2012 and 2013; however, Mr. Gutierrez spent more time with G.A.A.Q. than was actually set forth in the Parties' agreement. Father and son had regular contact. Mr. Gutierrez also took his son on vacations and spent some holidays with him.

In August 2017, G.A.A.Q. told his father that he did not want to have any more visitation with him. G.A.A.Q. did not like the way that his father asked him questions about Ms. Sandoval's personal life. Mr. Gutierrez and Mr. Gutierrez's mother (G.A.A.Q.'s grandmother) also made G.A.A.Q. feel uncomfortable with comments about his weight and the food that he was eating.

Ms. Sandoval brought G.A.A.Q. to the United States in November 2017, to live with her, her new husband, and G.A.A.Q.'s half-sibling. After consulting with her Mexican lawyer, Ms. Sandoval was under the impression that she could legally bring G.A.A.Q. to the United States. She did not make any effort to contact Mr. Gutierrez to let him know that she was moving G.A.A.Q. out of the country or to seek his input on the decision.

Mr. Gutierrez had no idea where his child was, and went through an extended period, lasting until December 2018, of trying to find G.A.A.Q. He repeatedly visited the house where

---

[2] The redacted trial transcripts may be found at Docket Nos. 49, 50.

G.A.A.Q. had been living with Ms. Sandoval and her parents and called all of the phone numbers he had for G.A.A.Q., Ms. Sandoval, and her parents. No one answered, and no one ever contacted him to let him know his son's whereabouts, despite the fact that he has had the same phone number the entire time in question. Eventually, Mr. Gutierrez was notified by G.A.A.Q.'s school that his son had been withdrawn from the school. A letter from the school shows the date of withdrawal as October 27, 2017. Mr. Gutierrez desperately searched for G.A.A.Q., going to the extent of visiting hospitals and even the morgue.

Mr. Gutierrez continued to investigate, using social networking and research, and eventually concluded that G.A.A.Q. was in Nashville, Tennessee. He filed his Petition for Return of Minor Child to Petitioner on October 10, 2018. It was not until the first scheduled court hearing in this case in December 2018 that he finally obtained a valid phone number from Ms. Sandoval. He had neither seen nor spoken to his son from August 2017 until that time.

G.A.A.Q. will be sixteen in November 2019. He attends a local Nashville high school, and recently completed ninth grade with all A's. He has many friends at school. He gets along well with his mother, stepfather, and half-brother, with whom he lives. He does not keep in touch with anyone in Mexico and does not want to return to Mexico.

### III. CONCLUSIONS OF LAW

#### A. The Hague Convention and ICARA

The Hague Convention was adopted in 1980. T.I.A.S. No. 11,670, S. Treaty Doc. No. 99-11. In 1988, the United States ratified the treaty and passed implementing legislation, "ICARA." 102 Stat. 437, 22 U.S.C. § 9001, *et seq. See generally Abbott v. Abbott*, 560 U.S. 1, 130 S. Ct. 1983 (2010). Article 3 of the Hague Convention states that the removal or the retention of a child is to be considered wrongful when "it is in breach of rights of custody

attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so but for the removal or retention."

Once a petitioner establishes, by a preponderance of the evidence, that removal or retention was wrongful, Article 12 of the Convention provides that:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention; the authority concerned shall order the return of the child forthwith.

Hague Convention, Art. 12; *see also Chafin v. Chafin*, 568 U.S. 165, 169, 133 S.Ct. 1017 (2012).

ICARA provides that an individual seeking the return of a wrongfully removed or retained child may do so by "commencing a civil action by filing a petition" in a court with jurisdiction over the action. 22 U.S.C. § 9003(b). The federal district courts and state courts have concurrent jurisdiction over such actions. 22 U.S.C. § 9003(a). In evaluating a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered. Hague Convention, Article 19; *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*"). The goal of the Convention is to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*").

In the case of an action for the return of a child, the petitioner has the burden of establishing, by a preponderance of the evidence, "that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003 (e)(1)(A). Once a petitioner

5

meets this burden, return of the child will be ordered unless the respondent prevails on one of the affirmative defenses enumerated in the Convention. 22 U.S.C. § 9003 (e)(2)(A)-(B). Despite the establishment of a prima facie case of wrongful removal or retention, a court may decline to order return of a child if the respondent proves by a preponderance of the evidence that the petition for return was filed more than one year from the removal or retention and that the child is well-settled in his or her new environment; or that the petitioner was not actually exercising his or her custody rights at the time of the removal or retention; or that the petitioner had consented to or acquiesced in the removal or retention; or if the Court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 22 U.S.C. § 9003(e)(2)(B), incorporating Articles 12 and 13 of the Hague Convention.

Further, a court may decline to order return if the respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation;" or the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, Articles 13(b), 20.

**B. <u>Petitioner's Prima Facie Case</u>**

In order to establish a prima facie case in the context of the Hague Convention, Mr. Gutierrez must prove, by a preponderance of the evidence, that Mexico was G.A.A.Q.'s habitual residence at the time he was removed from the country; that Mexico is a treaty partner with the United States under the Hague Convention; that the Petition was filed within one year of G.A.A.Q.'s removal from Mexico; that G.A.A.Q. is under the age of 16; that Mr. Gutierrez had

6

custody rights under the laws of Mexico and that the removal was in breach of those rights; and that Mr. Gutierrez was actually exercising his custody rights at the time of the removal. *Friedrich I*, 983 F.2d at 1400.

Neither Party disputes that Mexico was G.A.A.Q.'s habitual residence at the time he was removed from that country, or that Mexico and the United States are treaty partners under the Hague Convention. They further agree that G.A.A.Q. is under the age of 16 and that Mr. Gutierrez has rights of custody under the laws of Mexico. Evidence presented in the case supports these conclusions, and the Court finds that those elements are established. While Ms. Sandoval has at times offered slightly different estimates of when she brought G.A.A.Q. to the United States, sometimes indicating late October 2017, and other times November 2017, it is undisputed that Mr. Gutierrez filed his Petition on October 10, 2018, which is less than one year from either late October or November 2017. Therefore, the Court finds that Mr. Gutierrez has established that he filed his Petition within one year of G.A.A.Q.'s removal.

Ms. Sandoval testified that Mr. Gutierrez was not exercising his custody rights at the time of removal, but agreed that he was exercising those rights in the summer of 2017. Based upon all of the testimony and evidence presented, the Court finds that Mr. Gutierrez was exercising his custody rights at the time of removal. As Mr. Gutierrez has established all of the elements required, the Court finds that he has met his burden to prove a prima facie case of wrongful removal under the Hague Convention and ICARA. Therefore, the Court finds that the removal of G.A.A.Q. from Mexico in the fall of 2017 was wrongful as defined by the Convention.

## C. Affirmative Defense – the Child Maturity or Child Objection Defense

As an initial matter, the Court finds that Ms. Sandoval has not met her burden of proof to establish the well-settled defense or the grave risk of harm defense, although she occasionally made statements seeming to indicate that she thought one or the other defense might apply here. *See* Hague Convention, Art. 12, 13.

Article 13 of the Convention gives the Court the discretionary power to refuse return of the child where the child objects and is of sufficient age and maturity that the objection should be taken into account by the Court. The Court must first determine whether the child has sufficient age and maturity, and then evaluate the child's objection and determine that it is not the result of "brainwashing of the child by the alleged abductor." 51 FR 10494-01, Hague Int'l Child Abduction Convention, Text and Legal Analysis, III(I)(2)(d); *see also Neumann v. Neumann*, 310 F. Supp. 3d 823, 838-39 (E.D. Mich. 2018). The Convention does not establish a minimum age at which a child is old enough and mature enough for his or her views to be taken into account; rather, "[t]he determination of a child's maturity level is 'fact-intensive and idiosyncratic.'" *Olson v. Olson*, 185 F. Supp. 3d 1021, 1032 (M.D. Tenn. 2013), *quoting McClary v. McClary*, 2007 U.S. Dist. LEXIS 76068, 2007 WL 3023563 (M.D. Tenn. 2007). Nevertheless, the explanatory report on the Convention states that "it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.'" Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 30, in 3 Acts and Documents of the Fourteenth Session 426, 433 (1980); *see also Neumann*, 310 F. Supp. 3d at 839.

The Court finds that such is the case here. G.A.A.Q. will be 16 in just over four months. The Court spoke with him and took his testimony in camera, out of the presence of either parent

or their attorneys. During its interview with G.A.A.Q., the Court found him to be alert, respectful, and intelligent. He exhibited an understanding of the witness oath, which he took, and then testified forthrightly and freely, answering the Court's questions thoughtfully. Given that G.A.A.Q. is almost 16, and that he exhibited appropriate maturity in his interview and testimony, the Court finds that he has the age and maturity required to have his views on the subject of return taken into account.

G.A.A.Q. was very clear that he objects to returning to Mexico. In addition to testifying at length about the many aspects of his life in Nashville that he enjoys, he testified specifically as to aspects of return to Mexico that he objects to. He testified that he is no longer in touch with anyone in Mexico and that he would have to start a whole new life there. He further expressed that the thought of going with his father was very stressful, as he has come to dislike spending time with Mr. Gutierrez for specific reasons, including perceived criticisms of his appearance and Mr. Gutierrez's practice of asking him questions about Ms. Sandoval's personal life. He also feels that life in Mexico is dangerous. He described seeing news reports of murders and kidnappings in his own neighborhood in Monterrey, and testified that it was "very scary." After taking his testimony and observing his demeanor, the Court finds that G.A.A.Q. has a definite objection to being returned to Mexico. This is a true objection to return, not simply a preference or a wish. *See Olson*, 185 F. Supp. 3d at 1032-33 (distinguishing between a child's "preference" and an "objection" to return).

The Court also finds that G.A.A.Q.'s testimony was not unduly influenced by Ms. Sandoval. G.A.A.Q. appeared open and forthright, and denied under oath any coaching or pressure by Ms. Sandoval. There were some inconsistencies in his testimony, and a few statements that were less than credible (as examples, the Court perceived that he downplayed the

9

degree to which he had previously enjoyed vacations with his father, and appeared to overestimate how much time his mother spent in the home after she first traveled to the United States). But upon observing his demeanor and taking his testimony as a whole, it did not appear that those statements were tainted by a desire to please Ms. Sandoval or to say the right thing to help her case. Rather, they were motivated by G.A.A.Q.'s own intense desire to avoid being returned to Mexico in the custody of his father.

Accordingly, the Court finds that this is one of those rare cases where the child objection must apply. G.A.A.Q. is only months away from turning 16, and his demonstrated maturity, as well as the bases, breadth, and depth of his objection to his return to Mexico meet the exception created by the Hague Convention's child objection defense to return of the child. The Court does not condone his wrongful removal from Mexico and condemns Ms. Sandoval's behavior in failing to contact Mr. Gutierrez, both before and after the removal. Nevertheless, this defense has been established by a preponderance of the evidence.

The establishment of the child maturity or child objection defense does not end the Court's inquiry. A court retains the discretion to return a child, despite the establishment of an affirmative defense, if return would further the aims of the Convention. *Friedrich II*, 78 F.3d at 1067. In this case, the further required review does not alter the result. The Court finds that the return of G.A.A.Q. to Mr. Gutierrez's custody in Mexico would be neither appropriate nor necessary to further the goals of the Hague Convention. There is no evidence that Ms. Sandoval, who is a Mexican citizen, came to the United States in order to gain a jurisdictional advantage, and no indication that any of her actions were motivated by a belief that Nashville would be a more hospitable forum for a custody battle. Therefore, the Court does not believe that return is necessary to further the objectives of the Hague Convention and declines to exercise its

discretion to order the return of G.A.A.Q. to Mexico. *See Aranda v. Serna*, 911 F. Supp. 2d 601 (M.D. Tenn. 2013) (declining to repatriate child where respondent did not cross international borders in order to gain a jurisdictional home court advantage).

## IV. **CONCLUSION**

For the foregoing reasons, Mr. Gutierrez's Petition (Docket No. 1), requesting that the Court order G.A.A.Q. repatriated to the custody of his father in Mexico is DENIED and the Petition is DISMISSED. Each party is to bear its own costs. The Clerk of the Court shall enter a final judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

_____
Jeffery S. Frensley
United States Magistrate Judge